IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-03392-RBJ-KLM

PHILLIP DAVID HASKETT,

     Plaintiff,

v.

GARY WOODROW FLANDERS,

     Defendant.

---

## FINDINGS, CONCLUSIONS AND ORDER OF JUDGMENT

---

The claims in this case not previously dismissed were tried to the Court on August 17 and 18, 2015.  Both parties represented themselves *pro se*.

### JURISDICTION

The plaintiff, Phillip David Haskett, is a citizen of Texas.  The defendant, Gary Woodrow Flanders, is a citizen of Colorado.  In his Amended Complaint Haskett asserted that Flanders' tortious conduct had caused Haskett to lose the benefits of an oral contract worth in excess of $93,000 and to suffer damage to his reputation.  ECF No. 30.  Accordingly, the jurisdiction of this Court was invoked pursuant to 28 U.S.C. § 1332.[1]

This Court questioned the bona fides of the claim that the matter in controversy exceeded the sum of $75,000 and warned the plaintiff in a previous order that it might deny costs to the plaintiff and even impose costs on the plaintiff if he were finally adjudged to be entitled to

---

[1] Plaintiff also asserted certain constitutional claims that would have supported federal question jurisdiction, but those were previously dismissed.

recover less than the sum or value of $75,000.  *See* 28 U.S.C. § 1332(b).  I will return to that subject later in this order.

## FINDINGS OF FACT

**Background.**

This case arises from disputes between the two men that date back at least to 2005.  The latest chapter arises from an incident that took place in front of the main branch of the Colorado Springs Post Office on November 1, 2012.  The defendant, Flanders, spotted the plaintiff, Haskett, in a line inside the post office.  He hurried out to his car, retrieved a camera, and began taking pictures of Haskett's car -- ostensibly because he thought it was an asset through which he might be able to collect an old debt.  When Haskett emerged, Flanders took pictures of him as well and, depending on whose testimony is believed, one or both of these gentlemen made unpleasant remarks.

This led to Flanders' claiming to the police that Haskett threatened to kill him; an officer's interview of two supposed eye witnesses; the officer's filing of an harassment charge against Haskett in municipal court; and ultimately, Haskett's asserting a malicious prosecution claim against Flanders in the present case.

In addition to calling the police, Flanders informed a business associate of both men, one Carvill, that Haskett had (during the post office exchange) implicated Carvill in a murder plot. Haskett claims that, as a result, Carvill reneged on an agreement to assign to Haskett a judgment that Carvill had previously obtained against Flanders.  This gave rise to claims of defamation and interference with contractual relations against Flanders.

My ability to find the facts is impacted to some considerable extent by my assessment of the credibility of the parties and witnesses, and I will start there.

**Credibility.**

1. <u>Phillip David Haskett</u>.

Mr. Haskett has a reputation for frivolous litigation, at least in the Fourth Judicial District (El Paso County, Colorado) District Court.  On April 15, 2010 in a case entitled *The Sarah D'ann Haskett Educational Trust. v. Stevens*, No. 09CV264, Judge G. David Miller of that court issued a remarkable order that can be found within Exhibit 6 in the present case.  Among other things the court made the following findings:

- that Haskett had "misused the legal system for the purposes of harassing and intimidating his adversary by filing numerous pleadings personally attacking his adversary and the Court and has consistently and willfully disobeyed express court orders;"

- that Haskett had been involved in more than 60 cases in the State of Colorado including 15 cases in the Fourth Judicial District;

- that in several of those cases "there have been serious problems with Haskett's conduct, to include failing to provide discovery information and repeatedly refusing to allow depositions to be set; and

- that "rather than being an uninformed or inarticulate lay person stumbling into the court system for the first time, Mr. Haskett is quite experienced with the process."  Ex. 6, Slip Op. at 1.

As a sanction, and "[w]ith the express approval of the Chief Judge of this Judicial District," the court ordered that Haskett could no longer appear *pro se* as a plaintiff in that district without first filing a motion advising the court of his litigation history including claims filed both by and against him; making certain representations about the bona fides of the new claims he wished to bring; obtaining court permission to file; and posting a bond deemed by the

court to be sufficient to protect the interests of the adverse party. *Id.* at 1-2.  Flanders suggests

that the present case was filed in federal court because Haskett wore out his welcome in the

Fourth Judicial District.

An equally remarkable document in the record of the present case, also within Exhibit 6,

is a letter that Haskett wrote to Flanders and Flanders' significant other on April 30, 2005.  After

rejecting an undisclosed settlement offer concerning something called the "Rohan transaction"

(more on that later), Haskett proclaims that he is preparing to sue them; that they will be forced

to spend tens of thousands of dollars; that "I enjoy litigation as a hobby;" and that "I invented the

concept of phony counterclaims as bargaining chips."  *Id.* at 1-2.

2.  Gary Woodrow Flanders.

Flanders, a former banker, has also had his problems in the Fourth Judicial District.  The

reason that Carvill, actually a corporation of which Carvill was a principal, had a judgment

against Flanders is that a default judgment was entered against Flanders, his significant other, his

company, and others, as a sanction for a pattern of discovery abuse and disobeying court orders.

*See GSCRP, Inc. v. Geotech Corp.,* No 07cv4746 (Fourth Judicial District November 18, 2008)

(Slip. Op., found in the present case at ECF No. 84 at 10-15.

Also, Flanders was convicted in federal court in Oklahoma of multiple counts of bank

fraud (two counts of willful misappropriate of bank funds, two counts of scheming to defraud a

bank, one count of making a false entry in a bank record, and one count of conspiring to make a

false statement to a bank).  *See United States v. Gary W. Flanders,* 491 F.3d 1197, 1202 (10th

Cir. 2007) (affirming in part, reversing in part, and remanding for further proceedings).

Moreover, in response to Haskett's request that Flanders admit those convictions, he denied the

request without further comment or explanation.  Ex. 44 at 4.

4

3.  Officer Dominick Luna.

Officer Luna was the patrol officer at the Colorado Springs Police Department who was

dispatched in response to Flanders' complaint against Haskett.  He too was sued in the present

case, but the claims against him have long since been dismissed.  Based on his lack of any

apparent interest in the outcome of the dispute between Haskett and Flanders, his manner and

demeanor on the stand, his responses to the Court's questions, and the consistency of his

testimony with his contemporaneous report, I found his testimony to be credible – the only truly

credible witness in the case.

4.  Mr. and Mrs. Capps.

Flanders told Officer Luna that two bystanders, Gene and Brenda Capps, witnessed at

least some of the confrontation at the post office.  Officer Luna contacted them at their home.  In

his report Officer Luna wrote,

> I then contacted Gene Capps DOB: 01/26/65 who informed me he was standing
> outside of the Post Office waiting for his wife to come out.  He advised me he saw
> an older gentleman Flanders writing down a license plate to a large black SUV.
> He stated the [sic] Flanders then started to take photographs of the vehicle.  He
> informed me a short time later another male came out of the Post Office wearing
> an orange shirt with grayish hair Haskett.  *He stated Haskett started to yell and*
> *curse Flanders out.  He stated he could not make out everything Haskett said, but*
> *most of it was threats on Flanders life*.
>
> Capps stated he never heard Flanders say anything back to Haskett.  He stated the
> [sic] Haskett got very close to Flanders but he never touched him.  *He stated this*
> *verbal assault occurred for several minutes before Flanders ran back inside to the*
> *Post Office*.  He advised me he then contacted Flanders to make sure he was okay
> and provided him with all of his information.

Police Report, Ex. 2, at 4 of 5.

Flanders' photographs confirmed that the gentleman with an orange shirt and grayish hair

was indeed Haskett.  In response to the Court's questions, Officer Luna confirmed that this is

what he was told by Mr. Capps.  He testified that he would not have filed the harassment charge

5

against Haskett had it not been for Mr. Capps' independent confirmation of the gist of Flanders' story.

However, it was Haskett who called Mr. and Mrs. Capps as witnesses at trial. Mrs. Capps testified that she did not hear any threats. Mr. Capps testified that he heard words exchanged but could only remember that Flanders called Haskett an SOB. He denied hearing Haskett make any threats and denied telling Officer Luna that Haskett made any threats.

Officer Luna did not doubt Mr. Capp's story when he told it shortly after the incident. Likewise, I do not doubt that what Mr. Capps told the officer at the time was that which the officer recorded in his report. I presume that Flanders would not have put Officer Luna in touch with the Capps had he not been confident that they would support his story. Thus, it was surprising that Mr. Capp's trial testimony was essentially the opposite of what he told Officer Luna then. Haskett talked to the Capps a couple of weeks before trial, and on the day of their testimony Haskett bought their lunch and apparently offered to buy their dinner as well. However, while the Capps appeared to be a bit down and out, I have difficulty believing that they would knowingly misrepresent facts under oath for such small rewards. Instead I suspect that the passage of time and perhaps the influence of hearing Haskett's story confused Mr. Capps. In any event, I did not find Mrs. Capp's testimony to be credible.

**Facts.**

The Court makes the following findings to a preponderance of the evidence, including the Court's assessment of the credibility of the witnesses as discussed above.

1. Phillip David Haskett and Gary Woodrow Flanders met each other in approximately 2003. They learned that they had a mutual interest in acquiring properties through acquiring tax deeds.

2.  In 2004 they entered into a written agreement of some kind.  The agreement is not in evidence, but it apparently involved some sort of joint participation in the acquisition of tax deeds.  One property they targeted has been referred to as the Rohan property.  In connection with the plan to acquire the Rohan property, Flanders lent Haskett $500.00, and Flanders' company, Geo-Tech, lent Haskett $3,000.00.  Both loans were documented by promissory notes.

3.  The relationship between Haskett and Flanders soured when Flanders decided that Haskett was "double dealing," essentially that Haskett was trying to cut Flanders out of the Rohan deal.  Flanders terminated their agreement in 2005.  The two loans have never been repaid.  The parties dispute whether success in acquiring and selling the Rohan property was a condition for repayment of the loans.

4.  The parties have been litigating and feuding with each other ever since the Rohan deal and their "profit sharing agreement" (or whatever it was) fell apart.

5.  How it happened that both men found themselves at the main branch of the Colorado Springs Post Office at the same time on November 1, 2012 is a mystery to me.  It might have been an odd coincidence.  In any event, Flanders discovered that Haskett was there and spotted a large, seemingly new black SUV parked in front bearing Texas license plates.  He decided that the vehicle probably belonged to Haskett, and that it might be an asset that he could use to obtain payment of the two notes that had gone unpaid for some eight years.

6.  Flanders retrieved a camera from his car and took a series of at least eight photographs (Exhibits Q through W and AB).  Three of them only show the vehicle's license plate and front window stickers.  The other five are of Haskett, some with and others without the vehicle in the background.  In one of the photographs, Ex. T, Haskett appears to be talking and approaching Flanders, although it is difficult to say much more than that.

7

7.  Flanders testified that he never said a word during the confrontation, notwithstanding Mr. Capp's testimony that Flanders called Haskett an SOB.  However, even if Flanders did not say anything, I find that it is more probable than not that Flanders was "in his face;" that his conduct was offensive; and that he was inviting trouble.

8.  Flanders went back into the Post Office and began to write down things that he claims Haskett said.  Meanwhile, Haskett got into his car and began to leave.  Flanders then came out of the office and contacted the two bystanders whom we now know to have been the Capps.  After confirming that the Capps had witnessed some of the confrontation and obtaining their contact information, Flanders finished his list.

9.  Some period of time later, described by Officer Luna as an hour or two later, Flanders walked into the Colorado Springs Police Operations Center, called 911, and reported that Haskett had threatened to kill him.  Officer Luna was dispatched to the Center and met with Flanders.

10.  Flanders presented his list of the things he claims Haskett said during the confrontation.  Flanders still has what he claims is the original list, which was marked and admitted as Exhibit A.  Per the list, Flanders says that Haskett said:

1. Go ahead Flanders write down my license.
2. Go ahead now, photograph my car.  It won't do you any good.
3. I paid $90,000 for this car and you will never live to take it away from me.
4. I am coming after you.  Then I am going to fuck you after I kill you.
5. You will never live to see this car again.
6. You will never see me coming.  I will get you when you least expect it.
7. Gordon Carville [sic] and I are both going to get you.
8. I know you are not living in LaVeta as you say.  You are hiding out in Colorado Springs.
9. I know that you get your mail here every day.
10. You will never get away from me.
11. You're a dead man Flanders.
12. I am going to jam my foot up your ass, right now.

11.  Officer Luna repeated the list in his report.  Ex. 2 at 4 of 5.  He omitted item 12, possibly because it appears to have been written on a separate sheet of paper.

12.  Flanders also told Officer Luna that Haskett had sued him six years ago, that Flanders had won the suit, and that he was awarded $100,000 by the judge.  *Id.*

13.  There is no evidence of any $100,000 judgment.  However, Officer Luna testified that he did confirm that both parties had several cases in the system.  He also talked to Mr. Capps who, as indicated above, corroborated that he heard Haskett make threatening statements about Flanders life.  Accordingly, Officer Luna decided that Haskett probably had verbally assaulted Flanders, and that Flanders felt threatened.

14.  Officer Luna decided to pursue an harassment claim in municipal court rather than a more serious claim because he did not believe that Flanders would have waited one or two hours to contact police if he truly believed that his life had been threatened.

15.  With respect to the alleged statement that "Gordon Carville [sic] and I are both going to get you," Officer Luna interpreted it as business-related, and that Haskett was saying that they would come after Flanders' money.  He did not interpret the statement to mean that Carvill would come after Flanders physically.

16.  I find that it is more likely than not that Haskett did make threatening statements to Flanders, not necessarily the exact statements that Flanders wrote down (he acknowledged to Officer Luna that the list was not verbatim), but statements threatening violence against Flanders.

17.  Like Officer Luna, I doubt that Flanders thought that Haskett's statements were true threats on his life.  It is true, as Haskett admitted and as Flanders knew, that Haskett sometimes carries a gun in his car.  In fact, Haskett admitted that he has been in trouble with the Colorado

9

Springs Police Department multiple times because of his guns.  Nevertheless, I find that it is

more probable than not that Flanders interpreted the statements as a hothead's blowing smoke.  I

find that it is more likely that he was angry, and that, after reflection, he decided that the incident

offered him an opportunity to cause Haskett some trouble.

18.  To some extent that did occur.  The harassment charge was eventually dismissed on

motion for lack of evidence.  Ex. 13, Transcript of February 19, 2013 hearing, at Tr. page 3.  But

before the dismissal Haskett claims to have incurred $12,384.43 in attorney's fees and expenses.

It does appear that he hired two lawyers, and that between them they billed $6,507.50.  He has

paid at least $2,000 of the attorney's bills.  Ex. 41 and 42.  He also claims to have incurred

$141.05 in service, fax and copying costs, and approximately $6,300 in travel and lodging costs.

Ex. 43, last page summary chart.  The latter expenses represent IRS mileage and per diem

averages rather than actual expenses, and, in any event, they appear to be substantially more than

what was necessary to defend a municipal charge that was dismissed without an evidentiary

hearing.

19.  As for Mr. Carvill, what I know from the record is that Flanders sent him a letter on

December 6, 2012, "Re: Haskett Murder Threats and Pending Court Proceeding."  Ex. 5.  The

letter begins with the statement, "Phillip David Haskett has recently implicated you in a murder

plot that was delivered to me on Thursday, November 1, 2012 in front of the U.S. Post Office at

Pikes Peak and Nevada in Colorado Springs."  *Id.*  The letter reports that Haskett's statements

were made in front of two bystanders, both of whom had been interviewed by the police, and that

the matter would be heard by a judge on December 13, 2012.  However, Flanders continued, he

did not believe that Carvill really was involved in a murder plot.  He explained that he was

notifying Carvill "on the chance that the police would contact you regarding this matter and you

would then know what this is all about." *Id.*  Having thus informed Carvill of Haskett's statement, Flanders changed the subject to the $38,977.77 he says he still owed on the default judgment Carvill's company had obtained against him.  Flanders asked whether Carvill would be open to a proposal to resolve that matter with a sweat-equity investment.  *Id.*

20.  Flanders' statement in his December 6, 2012 letter regarding Haskett's implicating Carvill in a murder plot is the statement that Haskett alleges caused Carvill to renege on an oral agreement to assign the remainder of the judgment (which Haskett had alleged was some $93,000, not $38,000) to Haskett.  Haskett claims that he had agreed to pay Carvill 25% of whatever he collected.  Flanders represented to the Court that Carvill responded to the letter, but his response, whatever it was, was excluded as hearsay.

21.  Neither party subpoenaed Carvill or called Carvill as a witness at trial.  Haskett admitted that he did not do so for tactical reasons, specifically, that he anticipated that Carvill would not support his claim that there was an oral contract to assign his judgment to Haskett and that Carvill backed out because of Flanders' December 6, 2012 letter.  Flanders claimed that while the trial was in progress he tried to contact Carvill and left messages indicating that he needed Carvill as a witness, but he received no response.

22.  No credible evidence was presented that Haskett and Carvill had an oral agreement whereunder Carvill would cause his company to assign his judgment against Flanders to Haskett or that Carvill reneged on any such agreement because of Flanders' letter.  No credible evidence was presented that the unsatisfied remainder of the judgment was worth anything close to $93,000.

## CONCLUSIONS OF LAW

### A.  First Claim: Defamation/Libel.

11

Haskett asserts that the December 6, 2012 letter in which Flanders advised Carvill that Haskett had implicated Carvill in a murder plot constituted libel per se. I agree. "To be defamation per se, that is, to be actionable without proof of special damages, a libelous statement must be (1) on its face and without extrinsic proof, unmistakably recognized as injurious (defamatory meaning) and (2) specifically directed at the plaintiff (identity)." *Gordon v. Broyles,* 99 P.3d 75, 78-79 (Colo. App. 2004). The statement unmistakably was injurious to Haskett on its face – it proclaimed that Haskett had accused Carvill of serious criminal misconduct. The statement was specifically directed at Haskett. And, while substantial truth is a defense, Flanders' statement was nothing short of poppycock. Even if Haskett said that he and Carvill were going to "get" Flanders, that is a far cry from implicating Carvill in a murder plot. Flanders let his anger at Haskett and his hope to curry favor with Carvill, get the better of him.

Of course, he did not prove that he sustained any monetary damages as a result. For all we know Carvill was no more impressed with the statement than I am, and as indicated above, there was no credible evidence of the purported agreement between Haskett and Carvill. But Haskett does not have to prove "special damages" (monetary loss) on a libel per se claim. He can in theory recover non-economic damages such as injury to his reputation or his feelings.

The problem is, there was no evidence that the letter to Carvill caused an injury to Haskett's reputation. Nor was there any meaningful evidence of an injury to his feelings. The evidence established Haskett as something of a bully who prides himself on using litigation to bring an adversary to his knees. There was no credible indication in the evidence that he felt humiliated or that he suffered serious mental anguish or anything of the kind.

However, for every wrong there is a remedy. The Court concludes that a nominal damages award of $500 is a fair, reasonable and appropriate award. The Court further finds that

the libelous statement was made in a malicious, willful and wanton manner.  Accordingly, the

Court awards punitive damages of an additional $1,000.

### B.  Second Claim: Intentional Interference with a Contractual Relationship

The elements of the tort of intentional interference with contract are (1) that the plaintiff

had a contract with a third person; (2) the defendant knew or reasonably should have known of

the contract; (3) the defendant by words or conduct intentionally caused the third person not to

perform the contract; (4) the interference was improper; and (5) the interference caused the

plaintiff damages or losses.  *See Westfield Development Co. v. Rifle Inv. Associates,* 786 P.2d

1112, 1117 (Colo. 1990); Colorado Jury Instructions – Civil, § 24:1 (2015 ed.).  Because Haskett

did not prove that he had a contract with Carvill, much less that Flanders' letter caused Carvill

not to perform the contract, this claim was not established.

### C.  Third Claim: Malicious Prosecution.

Under Colorado law, the elements of a claim of malicious prosecution arising from a

prior criminal prosecution are (1) a criminal case was brought against the plaintiff, (2) it was

brought as a result of statements made by the defendant, (3) the case ended in the plaintiff's

favor, (4) the defendant's statement was made without probable cause, (5) the defendant's

statement was motivated by malice towards the plaintiff, and (6) as a result of the case, the

plaintiff had damages.  *See Montgomery Ward & Co. v. Pherson,* 272 P.2d 643, 645 (Colo.

1954); Colorado Jury Instructions – Civil § 17:1 (2015 ed.).

I conclude that at least four and probably five of the six elements have been established.

The Colorado Springs Police Department brought a criminal case, albeit a municipal ordinance

violation, against Haskett.  It was brought as a result of statements made by Flanders to the 911

Operator and to Officer Luna.  The case ended in Haskett's favor.  And Haskett sustained

damages in the form of attorney's fees and some other expenses as a result of the case.

As for the second element, motivation by malice, I find by a preponderance of the

evidence that Flanders' report to the police was at least partially motivated by malice towards

Haskett.  These two men despise each other.  I have found that Haskett probably did make a

number of nasty and threatening statements, even to the point of threatening Flanders' life.

Unlike Flanders' statement to Carvill in his December 6, 2012 letter, there was a basis in fact for

his report to the police.  But I have also found it to be more likely than not that, after reflecting

on the incident for an hour or more, Flanders was angry and saw a police report as an

opportunity to cause Haskett some trouble.  I do not know what was in Flander's mind, but given

the circumstances and the history of bad blood between these guys, I find that it is reasonable to

infer that malice was at least one motivator.

However, I do not find that Flanders' statements to the police were made without

probable cause.  A statement to the police lacks probable cause if it was made without a

reasonable and good faith belief that the plaintiff was guilty of the offense with which he was

charged.  *See Konas v. Red Owl Stores, Inc.,* 404 P.2d 546, 547-48(Colo. 1965); Colorado Jury

Instructions – Civil § 17:2 (2015 ed.).  Officer Luna charged Haskett with harassment in

violation of § 9.2.107 of the Colorado Springs Municipal Code.  Ex.1 at 1 of 5.  I take judicial

notice of the law.  Section 9.2.107 states in pertinent part: "A person commits harassment if, with

intent to harass, annoy or alarm another person, that person: . . . B. Follows a person in or about a

public place; or C. Repeatedly insults, taunts, or challenges another in a manner likely to provoke

a violent or disorderly response."  Haskett's actions and statements in front of the Post Office

plainly were probably made with the intent to harass, annoy or alarm Flanders.  Haskett's

14

15

conduct could reasonably be interpreted as insults, taunts, or challenges made in a manner likely

to provoke a disorderly response.  I do not find, in the circumstances, that Flanders had no

probable cause to report that he had been insulted, taunted and challenged.

Accordingly, I conclude that the Third Claim was not proven.

**JURY COSTS**

Haskett's Amended Complaint sought $10 million in damages from Flanders. Coming from an experienced litigant, that inflated number speaks for itself. But having now tried the case, it is clear that plaintiff could not and did not establish that he is entitled to recover anything close to the $75,000 jurisdictional minimum. The only economic damage he claimed was based on the defendant's alleged interference with a contract worth more than $93,000 – a claim that turned out to be unsupported by any credible evidence. He also claimed non-economic damages, i.e., damage to his reputation and emotional anguish. He did not prove any significant damage of those types either.

On top of everything else, Haskett demanded a jury trial. At the trial preparation conference Flanders indicated that he would waive a jury trial, but Haskett was adamant. Then, two business days before trial, Haskett announced that he would waive his jury demand – without consulting Mr. Flanders – and he advised that he would consent to the jurisdiction of a magistrate judge provided that the trial would be referred to Magistrate Judge Mix. ECF No. 120. He described this case as "precisely the type of 'minor' dispute intended by Congress to be heard by a magistrate judge." *Id.* at 3.

It was not until the morning of trial that this Court was informed that both parties would stipulate to a bench trial by this Court. By then 22 prospective jurors had been summoned and had appeared for jury duty. I attach a certificate from the Clerk of Court certifying that bringing in those jurors cost the United States District Court $1,547.65.

This conduct is consistent with Mr. Haskett's litigation history. He does not seem to care whom he inconveniences or at what cost. He is perfectly willing to claim that the matter in

controversy exceeds $75,000 in order to get into federal court, only to turn around and describe the case as "minor" when that suited him. The evidence resoundingly established that the case was indeed minor and had no business being filed in a federal court. Accordingly, exercising its authority under 28 U.S.C. § 1332(b), the Court assesses the jury costs of $1,547.65 against Mr. Haskett and orders that he remit his payment to the Clerk of this Court no later than 30 days following the issuance of this order.

## ORDER

The Court directs that judgment enter in favor of the plaintiff, Phillip David Haskett, and against the defendant, Gary Woodrow Flanders, in the amount of $1,500 on plaintiff's first claim for relief. The Court directs that judgment enter in favor of the defendant and against the plaintiff on plaintiff's second and third claim for relief dismissing those claims with prejudice.

The Court finds that the plaintiff is the prevailing party for purposes of Fed. R. Civ. P. 54(d)(1). He may apply for an award of costs to be taxed by the Clerk of Court as provided in D.C.COLO.LCivR (local rule) 54.1. However, the Court imposes jury costs against the plaintiff in the amount of $1,547.65, pursuant to 28 U.S.C. § 1332(b) and orders that Mr. Haskett pay that amount to the Clerk of Court within 30 days of the issuance of this order.

DATED this 10th day of September, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

17